# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| NADIRAH J. JEFFERIES, | : | |
| Plaintiff, | : | CIVIL ACTION |
|  | : | |
| v. | : | NO. 07-0557 |
|  | : | |
| AMERIQUEST MORTGAGE CO., | : | |
| Defendant. | : | |
|  | : | |

## Memorandum and Order

YOHN, J.                                                   February ____, 2008

Nadirah Jefferies brings a predatory lending lawsuit against defendant Ameriquest Mortgage Co. ("Ameriquest"), alleging various federal and state law claims.[1]  Jefferies brings the following claims:  (1) negligence; (2) violation of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*; (3) violation of the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. § 1639 *et seq.*; (4) violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*; (5) fraud; (6) breach of contract; (7) violation of the Pennsylvania Fair Credit Extension Uniformity Act, 73 Pa. Cons. Stat. § 2270.1 *et seq.*; (8) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. § 201-1 *et seq.*; and (9) punitive damages.  On August 1, 2007, Ameriquest filed a motion for summary judgment on all of Jefferies's claims.[2]

---

[1] Jefferies filed this lawsuit in the Philadelphia County Court of Common Pleas on January 22, 2007.  Ameriquest properly removed it to federal court on February 9, 2007.

[2] Jefferies's Complaint also alleges a violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, but she withdrew this claim in her response to Ameriquest's motion for summary judgment.

For the reasons discussed below, the court will grant Ameriquest's motion in part and deny it in part.

I.      **Factual Background**[3]

     A.      **Background and Loan Application Process**

Jefferies is the sole owner of a property located at 2004 South Opal Street, Philadelphia, Pennsylvania.  (Def. Statement Undisputed Facts ¶ 1; Pl. Statement Undisputed Facts ¶ 1.)  When Jefferies purchased the property in late 1999 or early 2000, she financed it with a mortgage through Commerce Bank.  (Nadirah Jefferies Dep. 16:2-14, May 23, 2007.)  The fixed interest rate on the mortgage was 9.9%, and her monthly payment was $249.  (*Id.* at 16:21-17:8.)

In early 2005, Jefferies wanted to refinance her mortgage, so she contacted Ameriquest and spoke with David Petion at Ameriquest's Plymouth Meeting branch to discuss refinancing.  (*Id.* at 17:21-22, 18:14-21.)  Jefferies was unemployed when she applied for her loan with Ameriquest, and her sole source of income at that time was $884 in biweekly workers' compensation benefits.[4]  (*Id.* at 9:13-22, 11:16-12:1, 21:21-24.)   Jefferies attempted to obtain a

---

[3] The account contained in this section is comprised of both undisputed facts and Jefferies's factual allegations, and all facts and inferences are viewed in the light most favorable to Jefferies, the nonmoving party.  *Skoczylas v. Atlantic Credit & Fin., Inc.*, No. 00-5412, 2002 WL 55298, at *2 (E.D. Pa. Jan. 15, 2002) ("When considering a motion for summary judgment, a court must view all facts and inferences in a light most favorable to the nonmoving party."); *see also Brown v. Muhlenberg Twp.*, 269 F.3d 205, 208 (3d Cir. 2001) (viewing facts on appeal of summary judgment "in the light most favorable to the [nonmoving parties], drawing every reasonable inference in their favor" (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 130 n.6 (3d Cir. 2001)).

[4] Jefferies received workers' compensation as a result of a February 5, 2003 on-the-job injury, and she continued receiving these benefits until her workers' compensation claim settled in August 2005, at which time she received a $40,000 settlement.  (Jefferies Dep. 8:4-7, 10:3-16, 11:2-11, 12:7-20.)

mortgage from other lenders at the same time, but she was not successful because of her unemployment. (*Id.* at 25:9-23.)  When Jefferies applied for her Ameriquest loan, she had approximately $18,500 outstanding on her Commerce Bank loan. (*See* Def. Mot. for Summ. J. Ex. J.)

Prior to the loan closing, Jefferies spoke with Petion on the phone on a regular basis to complete the application process. (Jefferies Dep. 18:22-19:1, 21:2-8.)  When applying for the loan, Jefferies explained to Petion that she was not employed and that her only income came from her workers' compensation benefits. (*Id.* at 21:23-22:2.)  Petion did not ask Jefferies for any documents regarding her income, and he explained to Jefferies that because of the type of loan she was getting, she did not have to verify her employment. (*Id.* at 21:9-17, 24:10-15.)

Although Jefferies did not ask for a specific interest rate for the loan, she requested the best interest rate possible. (*Id.* at 22:21-23.1)  Petion told Jefferies the rate would be 8.4%, and Jefferies thought this was too high. (*Id.* at 23:2-6.)  Petion responded that six months later, after her credit was cleared, Jefferies could return to Ameriquest to obtain a lower interest rate. (*Id.* at 23:5-10, 24:7-9, 25:2-4.)  Jefferies's final loan amount was $60,000, with a 8.4% interest rate, and her monthly payments were $457.11.[5] (*Id.* at 39:2:-40:3.)

─────────────────────

[5] All but one of Jefferies's credit cards were in collection when she applied for the loan from Ameriquest. (Jefferies Dep. 17:24-18:12.)  Initially, Jefferies only wanted enough money to pay off her outstanding debt in order to take out another loan to return to school. (*Id.* at 19:2-9.) The outstanding debt included bills from her credit cards, the gas company, the water department, and for her computer, as well as a previous student loan. (*Id.* at 20:3-14.)  After speaking with Petion, Jefferies learned she could also get cash from the loan, so she decided to get cash to make repairs to her home. (*Id.* at 20:15-18, 44:22-46:4.)  In the end, Jefferies received $16,000 in cash from the $60,000 loan so she could replace all of the windows and the front door in her home. (*Id.* at 46:5-12.)

**B.**      **The Loan Closing and the Loan Documents**

On the day of the loan closing, January 21, 2005, Jefferies went to Ameriquest's

Plymouth Meeting branch around 12:00 p.m. to meet with Petion in person for the first time.  (*Id.*

at 30:24-31:1.)  During this meeting, Petion explained the loan documents to Jefferies.  (*Id.* at

28:10-14.)  Jefferies did not have any questions at that time, and she did not have any problems

with anything that was in the loan documents.  (*Id.* at 28:10-21.)  Ameriquest did not allow

Jefferies to sign the loan documents at the office because there were some "issues."  (*Id.* at 27:3-

7.)  Jefferies did not know what these issues were, but she thought either the loan was not ready

or had not been approved.  (*Id.* at 27:3-9.)  Jefferies took the documents Petion had given her

home, and a notary came to her house around 8:30 p.m. that evening to sign the loan documents.

(*Id.* at 29:6-10, 31:1-2.)  The notary brought another set of loan documents for Jefferies to sign,

and he told Jefferies that the documents she was going to sign were the same documents that she

had gone over with Petion earlier that day.  (*Id.* at 29:6-17.)

The loan application Jefferies signed on January 21, 2005 states that she was employed as

an interior decorator and that her income was $3500 a month.  (*Id.* at 26:5-17, 32:17-21; Def.

Mot. for Summ. J. Ex. B.)  Jefferies was not, however, employed as an interior decorated when

she applied for the Ameriquest loan, nor was her income $3500 a month.  (Jefferies Dep. 26:18-

21, 32:22-33:1.)  Jefferies testified that the original loan application she went over with Petion on

the day of the loan closing (the "unsigned application") did not list her employment as an interior

decorator, but she was not certain if the unsigned application Petion had given her listed her

monthly income as $3500.[6]  (*Id.* at 29:2-5, 33:6-8.)  Jefferies never told the notary, Petion, or anyone at Ameriquest that the employment information and income listed on the signed loan application were incorrect.  (*Id.* at 33:2-5.)

On the day of the loan closing, Jefferies also signed a Stated Income Letter, which reads:

<u>STATED INCOME LETTER</u>

To Whom It May Concern:

I Nadirah Jefferies make 3500 a mo. as an Interior Decorator.

<u>s/Nadirah Jefferies   1/21/05</u>
Borrower           Date

(Def. Mot. for Summ. J. Ex. C.)  The body of the letter and the signature are both handwritten. (*Id.*)  When shown a copy of this letter, Jefferies acknowledged that her signature appeared on the bottom of the letter, but she testified that the handwriting above the signature that reads "I Nadirah Jefferies make 3500 a mo. as an Interior Decorator" is not her handwriting.  (Jefferies Dep. 33:9-16, 34:16-23.)   When asked to explain this discrepancy, Jefferies testified that after she left the Ameriquest office on the day of the loan closing, Petion told her that he needed her to sign a paper stating that he had gone over her employment history with her.  (*Id.* at 35:6-9.) Petion then faxed Jefferies a blank piece of paper, which she signed.  (*Id.* at 34:24-35:2.) Jefferies then gave the signed, but otherwise blank, piece of paper to the notary, and she never

---

[6] At her deposition, Jefferies initially testified that she kept a copy of the unsigned application and that she had given it to her attorney.  (Jefferies Dep. 29:18-23.)  When asked a second time about her possession of the unsigned application, Jefferies answered that she was not sure if she still had the copy of the unsigned application.  (*Id.* at 31:10-14.)  Ameriquest's attorney then made a formal, on-the-record request for production of that document, and Jefferies's attorney conceded that if Jefferies had possessed such a document, it would have been given to Ameriquest during discovery.  (*Id.* at 31:15-32:7.)

received a copy of the completed document.  (*Id.* at 35:10-19.)

Jefferies also signed several other documents at the closing.  One document was the

Adjustable Rate Note.  (*Id.* at 39:13-17; Def. Mot. for Summ. J. Ex. D.)  Petion explained the

terms in this document to Jefferies when she was at his office. (Jefferies Dep. 39:18-20.)  The

document confirmed that Jefferies was receiving a $60,000 loan from Ameriquest with an

interest rate of 8.4%, her monthly payments would be $457.11, and there was a three-year

prepayment penalty period.  (Def. Mot. for Summ. J. Ex. D.)

Another document Jefferies signed was entitled "Final Interest Rate, Payment Due, Fees

Paid, and Prepayment Charge."[7]  (Jefferies Dep. 41:10-14.)  Jefferies did not ask any questions

about the document when she signed it, and she did not verify that the document provided for a

three-year prepayment penalty period.  (*Id.* at 41:19-42:-6.)

Jefferies also signed the Important Notice to Borrowers on January 21, 2005.  (*Id.* at 47:4-

7; Def. Mot. for Summ. J. Ex. I.)  This notice stated:

> Oral agreements, promises or commitments to lend money, extend credit, or
> forebear [sic] from enforcing repayment of a debt, including promises to extend,
> modify, renew, or waive such debt, are not enforceable.
> To protect you (Borrowers(s)) and us (Lender) from misunderstandings or
> disappointments, any agreements we have reached covering this loan transaction are
> contained in the loan documents you have signed today.  Your loan documents are
> the complete statement of the loan agreement reached between us.  Any subsequent
> agreement between us regarding this loan transaction must also be a signed writing
> to be legally enforceable.
> BY  SIGNING  BELOW,  YOU  (BORROWER(S))  HEREBY
> ACKNOWLEDGE:
> (1) You have been given an opportunity to read your loan documents, have
> read them, and fully understand the terms of this loan transaction; and
> (2) You have received a full and complete set of all the loan documents you

[7] Neither party has provided a copy of this document, but Ameriquest's attorney
apparently showed it to Jefferies during her deposition.

6

have signed with this transaction, including a copy of this notice.

(Def. Mot. for Summ. J. Ex. I.)  Jefferies did not read this notice before she signed it at the loan

closing.  (Jefferies Dep. 47:8-10.)

      Additionally, Jefferies signed a Notice of Right to Cancel.  (*Id.* at 48:6-10; Def. Mot.

Summ. J. Ex. E.)  Either Petion or the notary explained to Jefferies that she had three business

days from January 21, 2005 to rescind her loan, but Jefferies did not attempt to rescind her loan

until she filed her Complaint on January 22, 2007.  (Jefferies Dep. 48:11-12, 49:21-50:1.)

Furthermore, Jefferies did not send any letters to Ameriquest, and prior to filing her Complaint,

she never made any written requests or complaints to Ameriquest.  (*Id.* at 53:20-22, 55:3-6.)

      The other documents Jefferies signed at the closing included the Truth in Lending

Disclosure Statement, Borrower's Acknowledgment of Final Loan Terms, Settlement Statement,

and Understanding Your Loan.  (*Id.* at 43:2-6, 43:13-17, 44:13-17, 47:21-48:1.)  The notary gave

Jefferies a copy of all of the documents she signed.  (*Id.* at 30:5-19.)  Jefferies did not read the

loan documents to confirm anything she had previously been told by Ameriquest representatives

or by the notary until August 2006.  (*Id.* at 42:3-43:1.)

    **C.**    **Attempted Refinancing of the Ameriquest Loan**

      Jefferies did not have any verbal contact with Ameriquest employees from January 21,

2005 until July 2005, when she called Ameriquest to see if she could get a lower interest rate on

her loan.  (*Id.* at 50:2-18.)  Although Jefferies had many conversations with Ameriquest

representatives regarding the refinancing of her loan, she never filled out another loan

application.  (*Id.* at 51:10-12, 52:5-8.)  In January 2006, an Ameriquest representative informed

Jefferies that she could not get a lower interest rate because she did not have six months of

verifiable employment history.  (*Id.* at 51:3-20.)

Jefferies contacted other loan companies in an attempt to find another loan with a lower interest rate, but she was told by nearly all of the lenders she contacted that she would not be able to get a loan because of her employment history.  (*Id.* at 52:17-21.)  In April 2007, she finally received another loan and paid off her Ameriquest loan.  (*Id.* at 53:2-7.)  When Jefferies paid off her Ameriquest loan, she had to pay a prepayment penalty of $2400.  (*Id.* at 53:16-19.)  Ameriquest also charged Jefferies $60 for what Ameriquest classified as "return check fees," and Jefferies believes Ameriquest erroneously charged her for this.  (*Id.* at 55:7-56:1.)  However, Jefferies had set up an electronic funds transfer to have her monthly payments automatically withdrawn from her account, and sometimes there would not be enough money in her account to cover the automatically withdrawn payments.  (*Id.* at 56:2-8.)

### D.     David Petion's Deposition Testimony

David Petion was an Ameriquest Account Executive from April 2003 to May 2006 and worked at its Plymouth Meeting branch in January 2005, but he does not remember his contact with Jefferies.  (David R. Petion Dep. 7:19-8:5, 13:5-10, July 6, 2007.)  Because Petion did not remember Jefferies specifically, he could only provide information regarding his and Ameriquest's normal procedures; he could not provide information specific to Jefferies's loan application.

Petion's job responsibilities as an Account Executive included acquiring new clients for Ameriquest.  (*Id.* at 12:11-14.)  When a customer would apply for a loan, the customer would verbally give Petion financial and other information.  (*Id.* at 22:11-14.)  Petion would put the customer's information into Ameriquest's system and check the customer's credit.  (*Id.* at 15-24.)

8

A processor would then process the loan.  (*Id.* at 22:21-23:3.)  The information on the customer's loan application would not change during the processing.  (*Id.* at 23:4-6.)  Furthermore, both the processor and the on-site manager would review each loan before it was funded.  (*Id.* at 38:8-18.)  Based on his personal experience, Petion believed that in January 2005 Ameriquest would not have approved a loan for a customer who was unemployed or who only had temporary income, such as workers' compensation.  (*Id.* at 23:20-23:13.)

Petion described the process by which Ameriquest typically received stated income letters from customers.  (*Id.* at 33:4-16.)  Ameriquest received these letters on blank pieces of paper, which would not be transferred onto a form with "stated income letter" at the top until the loan closing.[8]  (*Id.* at 34:2-15.)  When shown Jefferies's stated income letter, Petion assumed that her letter would have been signed at the loan closing because the letter had "stated income letter" on the top of the form in bold typeface.  (*Id.* at 33:17-34:2.)  Petion testified that the handwriting on Jefferies's stated income letter was not his, he did not recognize whose handwriting it was, and he would not speculate on whether it was Jefferies's handwriting.  (*Id.* at 31:5-21.)  When asked if someone else could have written the letter, Petion answered that he had never seen a processor or anyone else who worked for Ameriquest complete a stated income letter for the customer.  (*Id.* at 31:11-17.)

When shown a copy of Jefferies's loan application with the signature "David R. Petion" on it, Petion testified that it was not his signature.  (*Id.* at 26:9-10; *see also* Def. Mot. for Summ.

---

[8] The notary would not notarize the stated income letter.  (Petion Dep. 34:19-35:4.)  Additionally, Petion's job responsibilities did not require him to verify the contents of the letter, and he did not know whether anyone at Ameriquest was responsible for verifying the letter.  (*Id.* at 35:19-36:9.)

9

J. Ex. B.)  Petion did not know how his signature was put on Jefferies's loan application, and he declined to speculate on how it would have gotten there.  (Petion Dep. 26:11-16.)  Petion has never seen anyone else sign his name to a loan application, and he has never given anyone else authority to sign his name to a loan application.  (*Id.* at 26:22-27:3.)  Petion explained that allowing someone else to sign his name would violate "the rules."  (*Id.* at 27:4-13.)

Finally, Petion testified that he did not attend all of the loan closings on the accounts for which he was the Account Executive.  Approximately twenty percent of the loan closings for Petion's customers were done at the customer's home with only a notary present.  (*Id.* at 36:22-37:4.)  Although Ameriquest did not allow its Account Executives to attend loan closings unless the customer requested their presence, the Account Executives could meet with the customer prior to the closings to answer any questions the customer might have.  (*Id.* at 36:15-21.)

## II.    Discussion

### A.    Standard

Either party to a lawsuit may file a motion for summary judgment, and it will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from

10

which a rational person could conclude that the position of the person with the burden of proof

on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.*, 90 F.3d 737, 743

(3d Cir. 1996) (citation omitted).  Thus, "[w]here the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita*, 475 U.S. at 587 (citations omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-

movant is to be believed."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Furthermore, "[a]ll justifiable inferences are to be drawn in [the nonmovant's] favor."  *Id*.

"Summary judgment may not be granted . . . if there is a disagreement over what inferences can

be reasonably drawn from the facts even if the facts are undisputed."  *Ideal Dairy*, 90 F.3d at 744

(citation omitted).  However, "an inference based upon a speculation or conjecture does not

create a material factual dispute sufficient to defeat entry of summary judgment."  *Robertson v.

Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) (citation omitted).  The nonmovant

must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he

bears the burden of production.  *Anderson*, 477 U.S. at 252.  The nonmovant must present

concrete evidence supporting each essential element of its claim.  *Celotex*, 477 U.S. at 322-23.

**B.      Timeliness of Negligence Claim (Count I) and Fraud Claim (Count VI)**

Jefferies brings a negligence claim in Count I and a fraud claim in Count VI, alleging in

both counts that Ameriquest misrepresented that she had a two-year prepayment penalty, she

would be able to refinance her loan after six months to obtain a lower interest rate, and she was

an interior decorator making $3500 a month.  Ameriquest's sole argument as to why it should be

granted summary judgment on Jefferies's negligence claim is the affirmative defense that her

11

claim is barred by the statute of limitations.  Ameriquest also argues that Jefferies's fraud claim is time barred.[9]  Jefferies responds that her claims are not time barred under Pennsylvania Rule of Civil Procedure 106(b) and Pennsylvania's discovery rule.

Pennsylvania's two-year statute of limitations governs Jefferies's negligence and fraud claims, *see* 42 Pa. Con. Stat. § 5524(7), and the statute of limitations for claims arising from the day of the loan closing, which was January 21, 2005, expired on Monday, January 22, 2007.[10] Thus, Jefferies's negligence and fraud claims arising from any misrepresentations that were made on January 21, 2005 are not time barred because she timely filed this lawsuit in a Pennsylvania state court on January 22, 2007.

If the discovery rule applies, then the misrepresentations made prior to January 21, 2005 are also timely.  In Pennsylvania, "[t]he discovery rule applies 'to toll the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause at the time his right to institute suit arises.'"  *Drelles v. Mfrs. Life Ins. Co.*, 881 A.2d 822, 832 (Pa. Super. Ct. 2005) (quoting *Fine v. Checcio*, 870 A.2d 850, 859 (Pa. 2005)). Pennsylvania courts have applied the discovery rule to negligence claims, *see, e.g.*, *Wachovia Bank, N.A. v. Ferretti*, 935 A.2d 565 (Pa. Super. Ct. 2007), and to fraud claims, *see, e.g.*, *Lesoon v. Metro. Life Ins. Co.*, 898 A.2d 620, 267 (Pa. Super. Ct. 2006).  Application of the discovery

---

[9] Although Ameriquest does not address the merits of Jefferies's negligence claim, it does address the merits of her fraud claim, as discussed in Part II.F.

[10] Pursuant to Pennsylvania Rule of Civil Procedure 106(b):  "Whenever the last day of any [limitations] period shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation."  Jefferies's claims stemming from January 21, 2005 therefore expired on Monday, January 22, 2007, not on Sunday, January 21, 2007.

rule is often a factual issue:

> When a court is presented with the assertion that the discovery rule applies, it must address the ability of the damaged party, exercising reasonable diligence, to ascertain that he has been injured and by what cause.  Because this question involves a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily, a jury is to decide it.  However, where reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines, as a matter of law, that the discovery rule does not apply.

*Drelles*, 881 A.2d at 832 (quotations and citations omitted).

Jefferies argues that the discovery rule applies because she could not have discovered that the prepayment penalty period and her ability to refinance were misrepresented until she contacted Ameriquest in July 2005.  Ameriquest did not address the applicability of the discovery rule or whether Jefferies exercised reasonable diligence, and thus it has not shown there is no issue of material fact regarding the timeliness of claims arising from events that occurred prior to January 21, 2005.  Therefore, Ameriquest's motion for summary judgment on the negligence and fraud claims on the basis that they are untimely will be denied.

### C.      Truth in Lending Act ("TILA") Claim (Count II)

Jefferies's Complaint alleges that Ameriquest violated TILA, 15 U.S.C. § 1601 *et seq.*, and Regulation Z of the Federal Reserve Board, 12 C.F.R. § 226.1 *et seq.*, by failing to clearly and accurately provide Jefferies with all of the required material disclosures.[11]  Although

---

[11] Jefferies would be entitled to relief if Ameriquest did not provide her with two copies of the notice of her right to rescind or if Ameriquest did not fully and accurately disclose the prepaid finance charges.  The record establishes that Ameriquest notified Jefferies of her right to rescind and provided her with at least one copy of this notice.  (*See* Jefferies Dep. 48:6-12; Def. Mot. for Summ. J. Ex. E.)  Although Jefferies's Complaint alleges that she did not receive two copies, she does not address this allegation in her opposition to Ameriquest's motion for summary judgment.  Thus, she has not supported her claim of not receiving two copies of the notice, and the only issue addressed here is whether Ameriquest fully and accurately disclosed

Jefferies initially sought both statutory penalties and rescission of the mortgage under her TILA

violation claim, in her response to Ameriquest's motion for summary judgment she withdrew her

claim for statutory penalties.

TILA is a strict liability, remedial statute that is to be construed liberally in favor of

borrowers. *Smith v. Fid. Consumer Disc. Co.*, 898 F.2d 896, 898 (3d Cir. 1990). The purpose of

TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to

compare more readily the various credit terms available to him and avoid the uninformed use of

credit, and to protect the consumer against inaccurate and unfair credit billing and credit card

practices." 15 U.S.C. § 1601(a). "Accordingly, [TILA] requires creditors to provide borrowers

with clear and accurate disclosures of terms." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412

(1998).

Pursuant to congressional authorization, the Federal Reserve Board promulgated

Regulation Z to implement TILA. *Smith*, 898 F.2d at 898. TILA and Regulation Z require

lenders to provide material disclosures to borrowers and to notify borrowers of their right to

rescind the loans. *See id.* The material disclosures[12] must be disclosed "before consummation of

the prepaid finance charges.

      [12] "Material disclosures" are defined by TILA as:
         . . . [T]he disclosure, as required by this subchapter, of the annual percentage
rate, the method of determining the finance charge and the balance upon which a
finance charge will be imposed, the amount of the finance charge, the amount to be
financed, the total of payments, the number and amount of payments, the due dates
or periods of payments scheduled to repay the indebtedness, and the disclosures
required by section 1639(a) of this title.
15 U.S.C. § 1602(u).
      Similarly, under Regulation Z, "'material disclosures' means the required disclosures of
the annual percentage rate, the finance charge, the amount financed, the total payments, the
payment schedule, and the disclosures and limitations referred to in § 226.32(c) and (d)." 12

the transaction." 12 C.F.R. § 226.17(b).

The prepaid finance charges applied to a loan are part of the material disclosures TILA and Regulation Z require lenders to provide to borrowers, and these charges must be clearly and conspicuously disclosed. 15 U.S.C. §§ 1602(u), 1635(a); 12 C.F.R. § 226.23(a)(3) n.48. TILA defines a finance charge as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a). Similarly, Regulation Z defines a finance charge as "the cost of consumer credit as a dollar amount," which "includes any charge payable directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4.[13]

_____

C.F.R. § 226.23(a)(3) n.48.

[13] Examples of the finance charges which must be disclosed include:
(1) Interest, time price differential, and any amount payable under an add-on or discount system of additional charges.
(2) Service, transaction, activity, and carrying charges, including any charge imposed on a checking or other transaction account to the extent that the charge exceeds the charge for a similar account without a credit feature.
(3) Points, loan fees, assumption fees, finder's fees, and similar charges.
(4) Appraisal, investigation, and credit report fees.
(5) Premiums or other charges for any guarantee or insurance protecting the creditor against the consumer's default or other credit loss.
(6) Charges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation.
(7) Premiums or other charges for credit life, accident, health, or loss-of-income insurance, written in connection with a credit transaction.
(8) Premiums or other charges for insurance against loss of or damage to property, or against liability arising out of the ownership or use of property, written in connection with a credit transaction.
(9) Discounts for the purpose of inducing payment by a means other than the use of credit.

In mortgage refinancing transactions, TILA provides borrowers a three-day period in which they can rescind their loans.  15 U.S.C. § 1635(a).[14]  However, when a lender does not comply with TILA's notice and disclosure requirements, the borrower has a three-year right of rescission period.  15 U.S.C. § 1635(f); 12 C.F.R. § 226.23(3).[15]  As applicable to this case,

---

(10) Debt cancellation fees.  Charges or premiums paid for debt cancellation coverage written in connection with a credit transaction, whether or not the debt cancellation coverage is insurance under applicable law.

12 C.F.R. § 226.4(b).  In a residential mortgage transaction, if the following fees are bona fide and reasonable, they are not finance charges and do not have to be disclosed:

(i) Fees for title examination, abstract of title, title insurance, property survey, and similar purposes.

(ii) Fees for preparing loan-related documents, such as deeds, mortgages, and reconveyance or settlement documents.

(iii) Notary and credit report fees.

(iv) Property appraisal fees or fees for inspections to assess the value or condition of the property if the service is performed prior to closing, including fees related to pest infestation or flood hazard determinations.

(v) Amounts required to be paid into escrow or trustee accounts if the amounts would not otherwise be included in the finance charge.

12 C.F.R. § 226.4(c)(7).  Thus, if the fees listed in 12 C.F.R. § 226.4(c)(7) are not bona fide or reasonable, they must be disclosed.  Additionally, an application fee is not a finance charge, and does not have to be disclosed, if all applicants are charged that fee.  12 C.F.R. § 226.4(c)(1).

[14] 15 U.S.C. § 1635(a) provides:

Except as otherwise provided in this section, in the case of any consumer credit transaction . . . in which a security interest . . . is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so.

[15] The relevant portion of 15 U.S.C. § 1635(f) provides:

An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to

"[t]he finance charge is one of the 'material disclosure' items under Regulation Z and, if it is materially inaccurate, the rescission period is extended until three years after consummation." *Oscar v. Bank One, N.A.*, 2006 WL 401853, at *4 (E.D. Pa. Feb. 17, 2006); *see also Davis v. Deutsche Bank Nat'l Trust Co.*, 2007 WL 3342398, at *3 (E.D. Pa. Nov. 8, 2007) ("[T]he finance charge is one of the 'material disclosure' items under Regulation Z and, if it is materially inaccurate, the rescission period is extended until three years after consummation.").[16]

Ameriquest argues that Jefferies's rescission claim is untimely because Jefferies did not notify Ameriquest of her intent to rescind the mortgage executed on January 21, 2005 until she filed her Complaint on January 22, 2007, which is nearly two years after the three-day rescissory period ended.  Jefferies responds that her TILA rescission claim is not time barred because Ameriquest concealed some of the prepaid finance charges, rendering the disclosures materially inaccurate.  Thus, Jefferies argues, Ameriquest did not comply with TILA's disclosure requirements and the three-year rescissory period applies.

---

the obligor . . . .
Also, pursuant to 12 C.F.R. § 226.23(a)(3), "[i]f the required . . . material disclosures are not delivered, the right to rescind shall expire 3 years after [the loan's] consummation."

[16] When determining that the three-year rescissory period applies only when there is a material nondisclosure of terms, one court of appeals has explained that "nondisclosure is material if it is of the type that a reasonable consumer would view as significantly altering the total mix of information made available. . . . The information must be of the type that would affect a reasonable consumer's decision to use credit or to engage that creditor when comparison shopping for credit."  *In re Smith*, 737 F.2d 1549, 1554 (11th Cir. 1984) (internal quotations and citations omitted); *see also Malone v. Safety-Guard Mfg. Co., Inc.* 748 F.2d 312, 314 (11th Cir. 1984) (determining that three-year rescissory period applies only to material nondisclosures, and "in order to be material, the information not disclosed must be of some significance to a reasonable consumer under the circumstances in his comparison shopping for credit, although it need not be so important that a reasonable consumer would probably change creditors" (internal quotations and citations omitted)).

To support its motion for summary judgment, Ameriquest notes that Jefferies admittedly received a full set of loan documents at the loan closing and, therefore, she is not entitled to the three-year rescissory period.  The fact that Ameriquest presumably delivered the required disclosures[17] does not, however, defeat Jefferies's claim that Ameriquest's disclosures were materially inaccurate.  The finance charge and disclosures are considered accurate if they are (1) "understated by nor more than ½ of 1 percent of the face amount of the note or $100, whichever is greater"; or (2) are "greater than the amount required to be disclosed."  12 C.F.R. § 226.23(g)(1).  Ameriquest has not pointed to any evidence in the record that shows which finance charges it disclosed; therefore, it is not possible to determine whether the disclosures were accurate under Regulation Z.[18]

---

[17] Pursuant to TILA's requirements, Jefferies should have received a Federal Truth in Lending Disclosure Statement that listed her annual percentage rate, finance charge, total amount of payments, payment schedule, prepayment penalty, insurance requirement disclosures, and assumption disclosures.  In the Notice of Right to Cancel, Jefferies acknowledged that she had received the required disclosure statement.  (*See* Def. Mot. for Summ. J. Ex. E.)  When a consumer acknowledges in writing that she has received the disclosures, the acknowledgment creates a rebuttable presumption that the lender delivered the required disclosures.  15 U.S.C. § 1635(c).

[18] None of the documents in the record demonstrate which fees Ameriquest disclosed as the required prepaid finance charges.  The only document in the record that lists all of the charges is the Settlement Statement.  However, this document does not identify the previously disclosed prepaid finance charges, and it is not useful in determining which finance charges Ameriquest disclosed to Jefferies prior to the loan closing.  (*See* Def. Mot. for Summ. J. Ex. J.)  For purposes of summary judgment, which requires me to view the facts in the light most favorable to Jefferies, I will presume that the fees Jefferies listed as uncontested prepaid finance charges are the only fees Ameriquest disclosed as prepaid finance charges.  According to Jefferies, the disclosed prepaid finance charges totaled $4237.24.  (*See* Pl. Resp. Ex. B.)  She lists the following as the uncontested prepaid finance charges:  (1) $2439 loan discount; (2) $70 tax-related service fee; (3) $9 flood search fee; (4) $55.24 in interest; (5) $300 settlement closing fee; (6) $75 settlement disbursement fee; and (7) $64 courier fee.  (*Id.*)  The fees she listed, however, only total $3012.24, not $4237.24 as she claims.

Additionally, Jefferies has shown there are genuine issues of material fact as to whether Ameriquest's disclosures were materially inaccurate.  Jefferies's arguments regarding the material inaccuracies that lead to the disclosure violations can be broken into two categories:  (1) Ameriquest did not disclose all of the finance charges as required by 12 C.F.R. § 226.4(b), and (2) Ameriquest charged Jefferies fees that were not bona fide or were unreasonable and did not disclose these fees in violation of 12 C.F.R. § 226.4(c)(7).

Regarding the violations under 12 C.F.R. § 226.4(b),  Jefferies specifically argues that the following fees were not disclosed:  (1) $626 for a lender's processing fee paid to Ameriquest; (2) $239 for an administrative fee paid to Ameriquest; (3) $360 application fee paid to Ameriquest; (4) $40 tax certification fee paid to New Vision Pennsylvania Land Transfer ("New Vision"); and (5) $95 deed preparation fee paid to New Vision.  (*See* Pl. Resp. to Def. Mot. for Summ. J. Ex. B.)  Jefferies has raised genuine issues of material fact regarding the processing fee, administrative fee, tax certification fee, and deed preparation fee.  The lender's processing fee, administrative fee, and tax certification fee appear to fall under the service and transaction charges that 12 C.F.R. § 226.4(2) require lenders to disclose.    Additionally, Jefferies's loan was for a mortgage refinancing; she had already purchased her home.  Therefore, there would not have been a deed to prepare, and the deed preparation fee was an unreasonable fee that should have been disclosed.[19]

Jefferies also raises genuine issues of material fact as to whether Ameriquest's failure to

---

[19] The application fee does not have to be disclosed pursuant to 12 C.F.R. § 226.4(c)(1) as long as all of the lender's credit applicants are charged that fee.  Jefferies has not pointed to any evidence that demonstrates that Ameriquest only charged her this fee; therefore, she has not raised a genuine issue of material fact regarding the disclosure of this fee.

19

disclose fees that were not bona fide or were unreasonable under 12 C.F.R. § 226(c)(7) also rendered Ameriquest's disclosures of the finance charges materially inaccurate. Specifically, Jefferies argues that the (1) $700 appraisal fee, (2) $74.50 deed recording fee, (3) $69.50 mortgage recording fee, and (4) $618.75 title insurance fee were either unreasonable or were not bona fide. To support her argument that the $700 appraisal fee was not reasonable, Jefferies provided print outs from the Web sites of six appraisers that all have appraisal fees for similar properties in the $300-$350 range. (*See* Pl. Resp. to Def. Mot. for Summ. J. Ex. D.) Thus, Jefferies has shown there is a genuine issue of material fact as to whether the $700 appraisal fee was reasonable and whether Ameriquest had to disclose it. Additionally, because this was a refinancing transaction, there would not have been a deed to record. The deed recording fee was therefore not bona fide and reasonable, and Jefferies has raised a genuine issue of material fact as to whether this fee had to be disclosed.[20]

Ameriquest has not shown that there is no genuine issue of material fact with regard to whether it disclosed all of the prepaid finance charges, including the lender's processing fee,

---

[20] Jefferies has not raised a genuine issue of material fact regarding her allegations that the mortgage recording fee and title insurance fees were not bona fide or reasonable. First, Jefferies alleges that the $618.75 title insurance fee was an unreasonable amount. She does not, however, point to any evidence in the record to support this allegation and therefore has not shown there is a genuine issue of material fact regarding this allegation. *See Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) ("The non-movant may not rest upon mere allegations, general denials, or vague statements in opposition to summary judgment." (quotation marks and citation omitted)). Second, to support the argument that the $69.50 mortgage recording fee was not reasonable, Jefferies refers to a document entitled "Restated Fees of the Department of Records." (*See* Pl. Resp. to Def. Mot. for Summ. J. Ex. C.) The top of the document, however, clearly states that it is effective as of September 12, 2005; these fees were not in effect when Jefferies closed her loan and paid the fees on January 21, 2005. Therefore, the evidence regarding the reasonableness of the mortgage recording fee also does not raise a genuine issue of material fact.

administrative fee, application fee, tax certification fee, appraisal fee, deed preparation fee, and deed recording fee.  Accordingly, there is a genuine issue of material fact as to whether Ameriquest's disclosure of the finance charges was materially inaccurate.  Ameriquest has therefore not shown that it is entitled to judgment as a matter of law on the basis that Jefferies's TILA rescission claim is time barred.  Its motion for summary judgment will be denied.

**D.     Home Ownership and Equity Protection Act of 1994 ("HOEPA") Claim (Count III)**

Jefferies also claims that Ameriquest failed to make additional disclosures regarding her loan, in violation of HOEPA, 15 U.S.C. § 1639 *et seq.*  Ameriquest argues that HOEPA does not apply to Jefferies's loan because her loan was not a high-rate mortgage as defined by HOEPA. Ameriquest also argues that HOEPA has a one-year statute of limitations and that Jefferies's HOEPA claim is time barred because she did not bring it until two years after the loan closing. Jefferies responds that HOEPA applies to her loan and her claim is timely under 15 U.S.C. § 1635(f).

HOEPA, which amended TILA, requires the lender to disclose additional information at least three business days prior to the closing of the loan if the mortgage is a high-rate loan.  15 U.S.C. § 1639.  If a lender fails to materially comply with the disclosure requirements, the borrower can seek damages and rescission.  *See id.* § 1640.  HOEPA contains a one-year statute of limitations for actions seeking damages and a three-year limitations period for actions seeking rescission.  *Id.* § 1640(e); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 304-05 (3d Cir. 2005); 12 C.F.R. § 226.23.  Assuming HOEPA applies, Jefferies's claim for damages is time barred, but

her rescission claim is timely.[21]

Under the statutory provisions applicable here, HOEPA applies if the total points and fees paid by Jefferies at or before the closing exceed either eight percent of the total loan amount or $400, whichever is greater. 15 U.S.C. § 1602(aa)(1)(B). Determining whether HOEPA applies requires a two-step calculation: (1) calculating the amounts of points and fees, and (2) determining whether that amount exceeds eight percent of the total loan amount. Under the first step, points and fees are defined as:

> (i) All items required to be disclosed under § 226.4(a) and 226.4(b) [the finance charge], except interest or the time-price differential;
> (ii) All compensation paid to mortgage brokers;
> (iii) All items listed in § 226.4(c)(7) (other than amounts held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor; and
> (iv) Premiums or other charges for credit life, accident, health, or loss-of-income insurance, or debt-cancellation coverage (whether or not the debt-cancellation coverage is insurance under applicable law) that provides for cancellation of all or part of the consumer's liability in the event of the loss of life, health, or income or in the case of accident, written in connection with the credit transaction.

12 C.F.R. § 226.32(b)(1).

Under the second step, the "total loan amount is calculated by taking the amount financed, as determined according to § 226.18(b), and deducting any cost listed in § 226.32(b)(1)(iii) and § 226.32(b)(1)(iv) that is both included as points and fees under § 225.32(b)(1) and financed by the creditor." Official Staff Commentary, 12 C.F.R. Pt. 226, Supp.

---

[21] Although Jefferies correctly points out that the statute of limitations can be equitably tolled, *see Ramdan v. Chase Manhattan Corp.*, 156 F.3d 499, 505 (3d Cir. 1998), she does not argue why it should be tolled for her damages claim. Therefore, Ameriquest's motion for summary judgment on Jefferies's HOEPA damages claim will be granted.

I, § 226.32(a)(1)(ii).  The amount financed is calculated by (1) "[d]etermining the principal loan amount or the cash price (subtracting any downpayment)"; (2) "adding any other amounts that are financed by the creditor and are not part of the finance charge"; and (3) "subtracting any prepaid finance charge."  12 C.F.R. § 226.18(b).

Ameriquest calculated that HOEPA did not apply, but it did not follow the calculations required by the Code of Federal Regulations for either the first or second step of the calculation.  (*See* Def. Mot. for Summ. J. 12-14.)  Jefferies calculated that HOEPA did apply, but she also did not follow the calculations required by the regulations.  Furthermore, Jefferies's calculations included a mathematical error of $1225.  (*See* Pl. Resp. to Def. Mot. for Summ. J. Ex. B.)

In addition to using incorrect calculations, Ameriquest has not shown that there is no genuine issue of material fact regarding the factual information necessary to make an independent determination as to whether HOEPA applies.  Specifically, as discussed in the previous section, there is a genuine issue as to whether Ameriquest had to disclose the lender's processing fee, administrative fee, application fee, tax certification fee, appraisal fee, deed preparation fee, and deed recording fee.  This leaves a genuine issue as to which fees are properly included as "other amounts that are financed by the creditor and are not part of the finance charge," which 12 C.F.R. § 226.18(b)(2) requires to be calculated when determining the amount financed.  Thus, there is also a genuine issue as to which fees were prepaid finance charges, which must be calculated pursuant to 12 C.F.R. § 226.19(b)(3) when determining the amount financed.  In conclusion, Ameriquest's motion for summary judgment on Jefferies's HOEPA rescission claim will be denied because Ameriquest has not shown that there is no genuine issue of material fact regarding the applicability of HOEPA and that it is entitled to judgment as a

matter of law.

###### E.      Real Estate Settlement Procedures Act ("RESPA") Claim (Count IV)

In Count IV, Jefferies alleges that she made qualified written requests to Ameriquest pursuant to RESPA, 12 U.S.C. § 2601 *et seq.*, and that Ameriquest failed to reply as required by RESPA.  Ameriquest argues that it is entitled to summary judgment on this claim because, as admitted by Jefferies in her deposition, she never actually made any qualified written requests to Ameriquest; therefore, the RESPA disclosure requirements were never triggered.

Ameriquest's argument is correct.  Title 12 U.S.C. § 2605, the section Jefferies's Complaint alleges Ameriquest violated, requires the borrower to send a qualified written request to the lender in order to trigger the lender's duty to provide the requested information.[22] Although Jefferies alleges in her Complaint that she sent written requests and complaints to

---

[22] With respect to qualified written requests under RESPA, 12 U.S.C. § 2605(e)(1)(A) requires the following:

> If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.

A qualified written request is defined as:

> . . . [A] *written* correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that–
>
> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B) (emphasis added).

Ameriquest,[23] in her deposition she admitted that she did not actually send any written requests to Ameriquest.  (Jefferies Dep. 53:20-22, 55:3-6.)  Because Jefferies did not send a qualified written request to Ameriquest, Ameriquest did not have a statutory duty to send more information to Jefferies under RESPA.

In her response to Ameriquest's motion for summary judgment, Jefferies does not address the violations of 12 U.S.C. § 2605 she alleges in her Complaint.  Rather, she raises a new claim and argues that Ameriquest violated 12 U.S.C. § 2607(b).[24]  Jefferies cannot raise a new claim in her brief that she has not already pleaded.  *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 499 (3d Cir. 1997) (denying consideration of the plaintiff's claims that were not pleaded in his complaints but were raised on appeal of summary judgment because the defendants did not have "fair notice" of the claims); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 641-42 (3d Cir. 1993) (affirming the district court's rejection of a disparate impact claim that had not been pleaded and was not raised until after the close of discovery, at the summary judgment stage of a wrongful discharge case); *Armbruster v. Unisys Corp.*, No. 91-5948, 1996 WL 55659, at *4 (E.D. Pa. Feb. 7, 1996) (dismissing a disparate impact claim not raised until summary judgment motions were filed in a disparate treatment case because the disparate impact claim was not alleged in the complaint, discovery had been closed, and defendants would be prejudiced by

---

[23] In her Complaint, Jefferies alleges:  "At all times material, plaintiff made written requests and complaints to defendant."  (Compl. ¶ 31.)  She also alleges:  "The aforesaid requests constitute 'Qualified Written Requests' pursuant to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*"  (*Id.* ¶ 32.)

[24] 12 U.S.C. § 2607(b) provides:  "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed."

delayed raising of a new claim).

In conclusion, based on the 12 U.S.C. § 2605 violation alleged in Jefferies's Complaint, Ameriquest has shown there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on the RESPA violation claim. Ameriquest's motion for summary judgment on this claim will therefore be granted.[25]

## F.      Fraud Claim (Count VI)

In her fraud claim, Jefferies alleges that Ameriquest fraudulently misrepresented that she had a two-year prepayment penalty, could refinance her loan after six months to obtain a better interest rate, and was an interior decorator. Ameriquest argues that it is entitled to summary

---

[25] If Jefferies had properly and timely pled the 12 U.S.C. § 2607 violation claim, Ameriquest would still be entitled to summary judgment because Jefferies has not provided sufficient evidence of the essential elements of the claim. In her new allegations, Jefferies argues that the markups and overcharges she paid to Ameriquest "constitute RESPA violative fee splitting." (Pl. Resp. to Def. Mot. for Summ J. 16.) Jefferies classifies both markups and overcharges as "upcharges" and cites *Santiago v. GMC Mortgage Group, Inc.*, 417 F.3d 384 (3d Cir. 2005), to support her argument that both violate RESPA.

Contrary to what Jefferies concludes, however, in *Santiago* the Third Circuit clearly noted a difference between markups and overcharges. *Id.* at 387. The court held that there is no cause of action under RESPA for overcharges, but that RESPA allows a cause of action for unearned markups. *See id.* at 387, 389. Therefore, based on Third Circuit precedent, Jefferies clearly could not bring a claim for overcharges, but she could bring a claim for markups.

Unearned markups occur when the settlement service provider keeps a portion of the fees it charged the borrower for services it did not perform. *Id.* at 389. If Jefferies brought a claim for markups, she would bear the burden of proving at trial that instead of paying the fees Ameriquest charged Jefferies to the third parties who earned them, Ameriquest kept a portion of the fees for itself. To survive summary judgment on her markup claim, Jefferies would have to make a sufficient showing of this essential element. *See Celotex*, 477 U.S. at 322-23. Other than the conclusory allegations in Jefferies's reply brief, which do not point to any evidence in the record, there is no evidence that Ameriquest kept any portion of the fees it charged Jefferies for third-party services. These conclusory allegations are not sufficient to defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007) ("The non-moving party cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of fact its way." (citing *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).

judgment on this claim because Jefferies has not, and cannot, prove that she justifiably relied on any alleged misstatements.[26]  To support this argument, Ameriquest points to the areas in Jefferies's deposition where she testified that she signed and received copies of all of the loan documents, that Petion explained the loan terms to Jefferies, and that Jefferies understood the loan terms when she signed the documents.  Ameriquest also relies on the Important Notice to Borrowers that Jefferies signed, which contained an integration clause that clearly stated any oral agreements, promises, or commitments were not binding and that only the written terms in the signed loan documents were binding.  (*See* Def. Mot. for Summ. J. Ex. I.)

Jefferies contends that justifiable reliance is a factual question that cannot be decided at the summary judgment stage.  Relying on *Toy v. Metropolitan Life Insurance Co.*, 928 A.2d 186 (Pa. 2007), she further argues that because she alleges fraud in the execution, consideration of Petion's oral statements is not precluded by the parol evidence rule.

In Pennsylvania, the elements of fraud are "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."  *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994).  Therefore, at trial Jefferies will have to show that she justifiably relied on any alleged misstatements.  If Ameriquest is correct that there is no genuine issue of material fact relating to whether Jefferies justifiably relied on

---

[26] As previously addressed, Ameriquest also argues that it is entitled to summary judgment on the fraud claim because it is barred by the statute of limitations.  However, any alleged fraud that occurred on the day of the loan closing is not time barred and any claims relying on prior misrepresentations may not be time barred under the discovery rule.

any alleged misstatements, then it is entitled to summary judgment on the fraud claim. *See*

*Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 329-30 (3d Cir. 1995) ("When the

nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on

summary judgment by showing that the nonmoving party's evidence is insufficient to carry its

burden of persuasion at trial." (citing *Celotex*, 477 U.S. at 322-23)).

In *Toy*, the case Jefferies relies on to support her arguments, the Pennsylvania Supreme

Court addressed the fraud exception to the parol evidence rule.[27]  Under the fraud exception to

the parol evidence rule, "parol evidence may be introduced to vary a writing meant to be the

parties' entire contract[] when a party avers that the contract is ambiguous or that a term was

omitted from the contract because of fraud, accident or mistake." *Toy*, 928 A.2d at 204.  The

court has only applied this exception to allegations of fraud in the execution, not to allegations of

fraud in the inducement. *Id.* at 204-05.  Thus, "when fraud in the execution is alleged,

representations made prior to contract formation are not considered superseded and disclaimed

by a fully integrated written agreement, as they are when fraud in the inducement is asserted."

*Id.* at 206-07.[28]

Jefferies argues that she alleges fraud in the execution, meaning that evidence of the oral

---

[27] The *Toy* court addressed the fraud exception to the parol evidence rule as it applied to the justifiable reliance element of a consumer protection law claim; the court did not address justifiable reliance as it pertains to common law fraud.  Nonetheless, *Toy*'s reasoning and holding extend to the justifiable reliance element of common law fraud because of the broad language used and because Pennsylvania courts have repeatedly applied the fraud exception to common law fraud claims.

[28] Fraud in the execution is at issue where "a party alleges that he was mistaken as to the terms and the actual contents of the agreement he executed due to the other's fraud." *Toy*, 928 A.2d at 205.  For fraud in the inducement, "a party alleges that he was induced into entering the agreement through the other's fraud." *Id.*

statements can be properly introduced to show justifiable reliance. Ameriquest does not address the fraud exception to the parol evidence rule, nor does it address whether Jefferies argues fraud in the execution or fraud in the inducement. Ameriquest has therefore not met its burden of showing there is no genuine issue of material fact and that as a matter of law Jefferies cannot show justifiable reliance, which would entitle Ameriquest to summary judgment. Ameriquest's motion for summary judgment will be denied accordingly.

### G.    Breach of Contract Claim (Count VII)

Jefferies's complaint also broadly alleges that Ameriquest's conduct breached the parties' express or implied contracts, or both. To prevail on her breach of contract claim under Pennsylvania law, Jefferies must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999).

Ameriquest argues that it is entitled to summary judgment on this claim because neither the Complaint nor Jefferies's answers to Ameriquest's interrogatories identify the contract or the terms that Ameriquest allegedly breached. Presumably, Ameriquest is arguing that it is entitled to summary judgment because Jefferies has not established the existence of a contract and its essential terms. In her response, Jefferies argues that Ameriquest promised her she would be able to refinance the mortgage after six months at a lower interest rate and that there would only be a two-year prepayment penalty, that these promises constituted a contract, and that Ameriquest breached the contract by not adhering to these terms.[29]

---

[29] Ameriquest further argues that it is entitled to summary judgment on the breach of contract claim because Jefferies has not produced any evidence to demonstrate she sustained damages. However, this argument is incorrect because Jefferies had to pay a $2400 prepayment

Ameriquest did not address the merits of Jefferies's argument that the oral promises constituted a contract or whether parol evidence will be admissible under the fraud exception to alter the terms of the written agreement. Ameriquest has not shown that there is no genuine issue of material fact on Jefferies's breach of contract claim and that it is entitled to judgment as a matter of law, and its motion for summary judgment on this claim will be denied.

## H. Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA") Claim (Count VIII)

In her Complaint, Jefferies alleges Ameriquest violated FCEUA, 73 Pa. Cons. Stat. § 2270.1 *et seq.*, in the following ways: "Using unfair and unconscionable collection methods"; "Giving a false impression of the character, amount or legal status of the alleged debt"; "Using false and deceptive collection methods"; "Making threats and/or taking illegal action"; and "Otherwise using false, deceptive, misleading, and unfair and unconscionable means to collect and/or attempt to collect a debt." (Compl. ¶ 62.)

Ameriquest argues that it is entitled to summary judgment on Jefferies's FCEUA claim because Jefferies has not produced any evidence to show that Ameriquest unfairly or deceptively attempted to collect the debt and has not provided any evidence or specific information regarding the date, time, or method of communication in which Ameriquest attempted to collect the debt.[30] Jefferies's entire response to Ameriquest's motion for summary judgment on the FCEUA claim is: "As discussed, Defendant mischaracterized the character and amount of the debt. 73 P.S. §

_____

penalty when she paid off her Ameriquest loan, showing that if there was a contract and Ameriquest breached that contract, there were damages. (*See* Jefferies Dep. 53:16-19.)

[30] Ameriquest also argues there is no evidence in the record to show that it attempted to collect the debt after Jefferies's rescission demand. However, this lack of evidence has no bearing on Jefferies's allegations that Ameriquest mischaracterized the debt.

2270.4(b)(5)(ii) & (6)(I)."[31]  (Pl. Resp. to Def. Mot. for Summ. J. 12.)  Presumably, Jefferies is arguing that the alleged TILA disclosure violations constitute a mischaracterization of the amount and character of the debt.

As Jefferies correctly argues, if there were inaccurate or incomplete disclosures,  these would constitute violations of FCEUA, specifically of 73 Pa. Const. Stat. § 2270.4(b)(5)(ii). Ameriquest has not, however, addressed the claims that it gave a false impression of the character, amount, or legal status of the debt.  Additionally, as previously discussed, there is a genuine issue of material fact as to whether Ameriquest correctly characterized the prepaid finance charges.  Ameriquest's motion for summary judgment on the FCEUA claim will therefore be denied because it has not met its burden of showing there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

I.    **Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") Claim (Count VIII)[32]**

Jefferies also alleges that Ameriquest's actions constituted unfair and deceptive practices in violation of UTPCPL, 73 Pa. Con. Stat. § 201-1 *et seq.*  Specifically, Jefferies argues that Ameriquest's actions violated the UTPCPL and that its violations of TILA, HOEPA, RESPA, and FCEUA constitute per se violations of the UTPCPL.

The foundation of the UTPCPL is fraud prevention.  *Weinberg v. Sun Co.*, 777 A.2d 442,

---

[31] Under 73 Pa. Cons. Stat. § 2270.4(b)(5)(ii) a creditor's "false representation of the character, amount or legal status of any debt" is a violation of FCEUA.  Similarly, under § 2270.4(b)(6)(i), a creditor's "collection of any amount, including any interest, fee, charge or expense incidental to the principal obligation, unless such amount is expressly authorized by the agreement creating the debt or permitted by law," is a violation of FCEUA.

[32] Jefferies misnumbered her complaint and has two claims numbered Count VIII.

446 (Pa. 2001).  Pennsylvania courts have stated that "a plaintiff alleging violations of the

Consumer Protection Law [UTPCPL] must prove justifiable reliance," which is an element of

common law fraud.  *Toy*, 928 A.2d at 203; *see also Yocca*, 854 A.2d at 438; *Booze v. Allstate

Ins. Co.*, 750 A.2d 877, 880 (Pa. Super. Ct. 2000).  Thus, to avoid summary judgment, Jefferies

must be able to show that there is a genuine issue as to whether she justifiably relied on the oral

statements.[33]

---

[33] Courts in the Eastern District of Pennsylvania disagree with the Pennsylvania Superior Court about which elements must be proven to show a violation of the UTPCPL, particularly after the 1996 amendments to the law made "deceptive" as well as "fraudulent" practices unlawful.  *Compare Booze*, 750 A.2d at 880 ("In order to state a claim under the catchall provision of the Unfair Trade Practices and Consumer Protection Law, a plaintiff must prove the elements of common law fraud."), *with Becker v. Chi. Title Ins. Co.*, No. 03-2292, 2004 WL 228672, at *14 (E.D. Pa. Feb. 4, 2004) (disagreeing with *Booze* and reasoning "that the 1996 Amendments, by amending the UTPCPL to prohibit both fraudulent conduct and deception instead of solely fraud, eliminated the need to plead all of the elements of common law fraud"); *Flores v. Shapiro & Kreisman*, 246 F. Supp. 2d 427, 432 (E.D. Pa. 2002) (declining to follow *Booze* and concluding that "by adding a prohibition on 'deceptive' conduct, the 1996 amendment to the [UTPCPL] eliminated the need to plead all of the elements of common law fraud in actions under the [UTPCPL]" and that "[t]he new word 'deceptive' . . . must have been intended to cover conduct other than fraud").  Notably, the *Booze* court did not specifically address the 1996 amendments to the UTPCPL or whether the catch-all provision that includes "deceptive" conduct as violative of the statute requires a lesser standard.

Subsequent Pennsylvania Supreme Court cases have required plaintiffs to at least prove justifiable reliance, an element of common law fraud, to establish a UTPCPL violation.  *See Toy*, 928 A.2d at 202 ("As the type of reliance that a plaintiff alleging common law fraud must prove is justifiable reliance, . . . *Weinberg* [*v. Sun Co., Inc.*, 777 A.2d 442 (Pa. 2001)] necessarily states that a plaintiff alleging violations of the Consumer Protection Law must prove justifiable reliance." (citations omitted)); *Yocca*, 854 A.2d at 438 ("To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance.").  Again, however, the court has not specifically addressed the 1996 amendments and whether they changed the standard.  Nonetheless, because the Pennsylvania Supreme Court has identified justifiable reliance as one element of a UTPCPL violation, Jefferies will have to prove this element at trial.  Furthermore, because the parties only addressed the merits of the justifiable reliance element, at least as to the portion of Jefferies's claim that does not rely on violations of TILA, HOEPA, and FCEUA as being per se violations of UTPCPL, that is the only element addressed here.

Ameriquest argues that because Jefferies cannot show she justifiably relied on Petion's alleged oral statements, she cannot prove Ameriquest violated the statute.  Again, Ameriquest does not address Pennsylvania's fraud exception to the parol evidence rule and its application to allegations of fraud in the execution.  As previously discussed under Jefferies's common law fraud claim, evidence of the oral statements may be admissible at trial to vary the fully integrated, written contract, at least to the extent Jefferies alleges fraud in the execution.  If these statements are admissible, Jefferies may be able to show that she justifiably relied on them.  Therefore, Ameriquest has not meet its burden of showing that it is entitled to summary judgment on this aspect of the UTPCPL violation claim.

Ameriquest further argues that Jefferies's claim for relief under the UTPCPL based on the alleged TILA, HOEPA, RESPA, and FCEUA violations must fail because all of those claims fail.  Although Ameriquest's motion for summary judgment on the RESPA claim will be granted, genuine issues of material fact remain as to Jefferies's TILA, HOEPA, and FCEUA claims.  Thus, Ameriquest's motion for summary judgment on the UTPCPL claim on the basis that the TILA, HOEPA, and FCEUA claims fail will also be denied.

**J.      Punitive Damages Claim (Count IX)**

Jefferies also brings a claim for punitive damages, and Ameriquest argues that a claim for punitive damages is not an independent cause of action.  Clearly, "punitive damages are a remedy, not a cause of action." *Waltman v. Fahnestock & Co., Inc.*, 792 F. Supp. 31, 33 (E.D. Pa. 1992).  Furthermore, Pennsylvania courts have repeatedly held that a claim for punitive damages is not a separate cause of action.  *See, e.g.*, *Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800, 802 (Pa. 1989) ("If no cause of action exists, then no independent action exists for a

33

claim of punitive damage since punitive damages is only an *element* of damages."); *Nix v.*

*Temple Univ. of Commonwealth Sys. of Higher Educ.*, 596 A.2d 1132, 1138 (Pa. Super. Ct.

1991) ("A request for punitive damages does not constitute a cause of action in an[d] of itself.");

*Shanks v. Alderson*, 582 A.2d 883, 885 (Pa. Super. Ct. 1990) ("The right to punitive damages is

merely an incident to a cause of action and not a cause of action in and of itself."); *Robbins v.*

*Cumberland County Children and Youth Servs.* 802 A.2d 1239, 1253 (Pa. Commw. Ct. 2002)

("[P]unitive damages are a form of relief, not a separate cause of action under Pennsylvania

law.").  Because Jefferies's claim for punitive damages does not contain an independent cause of

action, Ameriquest's motion for summary judgment on this count will be granted.[34]

## III.    Conclusion

Ameriquest has not met its burden of showing that there are no genuine issues of material

fact and that it is entitled to judgment as a matter of law on Jefferies's negligence, TILA

rescission, HOEPA rescission, fraud, breach of contract, FCEUA, and UTPCPL claims, and its

motion for summary judgment on these claims will be denied accordingly.  Ameriquest has,

however, met its burden on the HOEPA damages, RESPA, and punitive damages claims, and its

motion for summary judgment as to these claims will be granted.  Additionally, pursuant to

Jefferies's withdrawal of the Equal Credit Opportunity Act and TILA damages claims, these

claims will be dismissed with prejudice.  An appropriate order follows.

---

[34] Granting Ameriquest's motion for summary judgment on Jefferies's separate claim for punitive damages does not affect Jefferies's separate requests for relief in the form of punitive damages in her other causes of action.  Thus, if at trial Jefferies prevails on any of her other claims in which she requests punitive damages, she may still be entitled to punitive damages.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NADIRAH J. JEFFERIES, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 07-0557 |
| | : | |
| AMERIQUEST MORTGAGE CO., | : | |
| Defendant. | : | |
| | : | |

## Order

AND NOW on this _____ day of February 2008, upon consideration of defendant's

motion for summary judgment (Docket No. 12) and plaintiff's response thereto, IT IS HEREBY

ORDERED that:

1.    Defendant Ameriquest Mortgage Co.'s motion for summary judgment as to the Real

Estate Settlement Procedures Act claim (Count IV), Home Ownership and Equity

Protection Act of 1994 damages claim only (contained in Count III), and punitive

damages claim (Count IX) is GRANTED.  Judgment is ENTERED in favor of defendant

Ameriquest Mortgage Co. and against plaintiff Nadirah Jefferies on these claims.

2.    The balance of Ameriquest's motion for summary judgment is DENIED.

3.    Pursuant to plaintiff Nadirah Jefferies's withdrawal of the Truth in Lending Act statutory

damages claim only (contained in Count II) and Equal Credit Opportunity Act claim

(Count V), these claims are DISMISSED with prejudice.

4.    Trial on the remaining claims is scheduled for May 12, 2008 at 10:00 a.m.

_____s/William H. Yohn_____
William H. Yohn Jr., Judge